1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

RICHARD G. TURAY,

                                    Plaintiff,

        v.

KELLY CUNNINGHAM, CATHI
HARRIS, and CHAPLAIN GREG
DUNCAN,

                                    Defendants.

No. C10-5493 BHS/KLS

**REPORT AND RECOMMENDATION**
**Noted for:  April 15, 2011**

Presently before the court is the Motion for Summary Judgment of Defendants Kelly

Cunningham, Cathi Harris, and Chaplain Greg Duncan.  ECF No. 24.  This court previously

issued a Report and Recommendation recommending that this motion be granted.  ECF No. 33.

Plaintiff filed objections (ECF No. 35) and Defendants filed a response to the objections (ECF

No. 36).

In the previous Report and Recommendation, this court cited to the threshold issues

applicable in a civil commitment setting as follows:

> In the civil commitment setting, a patient's liberty interests are balanced
> against the relevant state interests to determine whether the state has violated the
> patient's constitutional rights.  *Youngberg v. Romeo*, 457 U.S. 307, 318 (1982).
> The law generally requires a careful balancing of the rights of individuals who are
> detained for treatment, not punishment, against the state's interests in institutional
> security and the safety of those housed at the facility.  *See also*, *Hydrick v.
> Hunter*, 500 F.3d 978, 990 (9th Cir.2007) (citing *Youngberg*, 457 U.S. at 319-22):

REPORT AND RECOMMENDATION - 1

> In weighing those interests, it cannot be ignored that, unlike the plaintiff in *Youngberg*, who was civilly committed because of mental infirmities, SVPs have been civilly committed subsequent to criminal convictions and have been adjudged to pose a danger to the health and safety of others. Therefore, the rights of SVPs may not necessary be coextensive with those of all other civilly detained persons.

*Hydrick*, 500 F.3d at 990.

Plaintiff argued in his objections that the foregoing is a misconstruction of the *Hydrick* opinion and that he is entitled to the same rights as other civil committees who are not sexually violent predators.  ECF No. 35.

The United States Supreme Court vacated the Ninth Circuit's opinion in *Hydrick* in light of the pleading standards under Federal Rule of Civil Procedure 8(a) as articulated in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).  *See Hydrick v. Hunter*, 500 F.3d 978, 994 (9th Cir. 2007) (*vacated on other grounds by Hunter v. Hydrick,*  --- U.S. ---, 129 S. Ct. 2431, 174 L.Ed.2d 226 (2009)).  Thus, the District Court re-referred Defendants' motion for summary judgment for consideration in light of the Supreme Court's holding in *Hunter,* 129 S. Ct. 2431.

Having carefully reviewed the motion, supporting affidavits, and balance of the record, and viewing the evidence in the light most favorable to Mr. Turay, the undersigned again recommends that Defendants' motion for summary judgment be granted.  With the exception of deleting the *Hydrick* language*,* this recommendation is essentially identical to the court's previous recommendation as both recommendations were based on the *Youngberg* balancing test and the constitutional law applicable to Mr. Turay's claims.

## PROCEDURAL BACKGROUND

Mr. Turay is civilly committed to the Special Commitment Center (SCC), a total confinement treatment facility for sexually violent predators.  ECF No. 5, p. 2.  On July 12,

REPORT AND RECOMMENDATION - 2

2010, Mr. Turay filed his original complaint in this action, alleging that he and some of his family suffered "grief, pain, mental anguish, psychological abuse, and personal insult" when his request for escorted leave to attend his father's funeral was denied.  Mr. Turay claims that denial of his request for escorted leave was cruel and unusual.  *Id.*

On October 5, 2010, the Defendants filed their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) or in the alternative Rule 56(b), in lieu of an answer to the complaint.  ECF No. 14.  Mr. Turay filed a response in which he raised causes of action that had not been included in his original complaint (*i.e.*, (1) retaliation for exercising his First Amendment right to access the courts, (2) violation of equal protection, (3) cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments[1]; and, (4) violation of the United Nations Convention Against Torture.  ECF No. 17.   Because Defendants had submitted declarations and other evidence in support of the motion to dismiss, the court converted the motion to dismiss into one for dismissal pursuant to Rule 56(b) and gave the parties an opportunity to file additional briefing.  ECF No. 21.

Defendants filed their answer to the original complaint on December 3, 2010.  ECF No. 23.  On December 9, 2010, Defendants filed their motion for summary judgment, noting the motion for hearing on January 7, 2011.  ECF No. 24.  Defendants address the additional causes of action mentioned in Mr. Turay's response to their original Rule 12(b)(6) motion, even though the claims were not included in the original complaint.  *See* ECF Nos. 17 and 24.

Mr. Turay did not file a response to Defendants' motion for summary judgment. Instead, he filed a document entitled "Amendment to Claim," requesting that he be allowed to

---

[1] Although he did not specifically cite to the Eighth and Fourteenth Amendments in his complaint, such a claim might be inferred from a liberal construction of Plaintiff's claim that the denial "if [] not cruel and unusual punishment," certainly felt like it.  ECF No. 5, p. 4.

REPORT AND RECOMMENDATION - 3

1  assert damages in "the arbitrary figure of one million dollars."  ECF No. 22.  The court denied

2  the request because the rules do not require amendment to insert an "arbitrary" amount of

3  damages and because Mr. Turay did not submit an amended complaint that would operate as a

4  complete replacement to his original complaint.  ECF No. 27, p. 2.  The court also noted the

5  pending summary judgment motion and stated that the proposed amendment did not change the

6  substance of the claims asserted.  *Id.*, p. 3.

7      On January 6, 2011, Mr. Turay filed an "Amended Claim."  ECF No. 30.  The

8  undersigned considered the filing as a motion to amend and denied the motion to amend.  ECF

9  No. 32.

10

11                                **STANDARD OF REVIEW**

12      Summary judgment will be granted when there is no genuine issue as to any material fact

13  and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The party

14  seeking summary judgment bears the initial burden of informing the court of the basis for its

15  motion, and of identifying those portions of the pleadings and discovery responses that

16  demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

17  317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

18

19      Where the moving party will have the burden of proof at trial, it must affirmatively

20  demonstrate that no reasonable trier of fact could find other than for the moving party.

21  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986).   On an issue where the non-

22  moving party will bear the burden of proof at trial, the moving party can prevail merely by

23  pointing out to the district court that there is an absence of evidence to support the non-moving

24  party's case.  *Celotex*, 477 U.S. at 325.  If the moving party meets its initial burden, the opposing

25  party must then set forth specific facts showing that there is some genuine issue for trial in order

26

REPORT AND RECOMMENDATION - 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

to defeat the motion.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S. Ct. 2502, 91 L.Ed.2d 202 (1986).   The party opposing the motion must do more than simply show that there is some metaphysical doubt as to the material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  "A plaintiff's belief that a defendant acted from an unlawful motive, without evidence supporting that belief, is no more than speculation or unfounded accusation about whether the defendant really did act from an unlawful motive."  *Carmen v. San Francisco Unified School Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).

### STATEMENT OF FACTS

To request an escorted leave to attend a funeral, an SCC resident makes his request to the chaplain.  ECF No. 26, ¶ 2.  Greg Duncan is the chaplain and Religious Program Manager for the SCC.  *Id.*, ¶ 1.  When he receives a leave request, Chaplain Duncan gathers information from SCC files for the superintendent's review.  The superintendent makes the decision whether to approve or deny a request.  *Id.*

The superintendent of the SCC "may, subject to the approval of the secretary, grant escorted leaves of absence to residents confined" at the SCC to "(a)ttend the funeral of a member of the resident's immediate family."  *See* Wash. Rev. Code 71.09.210(1) and (2). Immediate family includes a resident's father.  *Id*. The superintendent evaluates each leave request and approves or denies the request based on: (1) the nature and length of the escorted leave; (2) the community risk associated with granting the request based on the resident's history of security or escape risk; (3) the resident's overall history of stability, cooperative or disruptive behavior, and violence or other acting out behavior; (4) the resident's degree of

REPORT AND RECOMMENDATION - 5

trustworthiness as demonstrated by his performance in living unit assignments, security

level, and general cooperativeness with facility staff; (5) the resident's family's level

of involvement and commitment to the escorted leave planning process; (6) the rehabilitative

or treatment benefits which could be gained by the resident; and (7) any other information

the superintendent deems relevant.  *See* Wash. Admin. Code 388-880-100.  Nothing in the

statute requires the superintendent to consult with the secretary if he denies a requested

leave; only that the secretary must approve the leave if the superintendent grants the request.

Kelly Cunningham has been the superintendent of the SCC since August 1, 2009.

ECF No. 25, p. 1, ¶ 1.  In late February 2010, Mr. Cunningham received Mr. Turay's written

request to attend an event honoring Mr. Turay's late father's life.  *Id.*, ¶ 2.  Mr. Cunningham

understood that the event was to be a funeral or celebration of life.  Mr. Turay's father had

passed away in mid-January 2010.  *Id.*  Mr. Turay reported that the event was to be held on

Sunday, March 20, 2010, at the Nordic Heritage Museum in the Ballard neighborhood of

Seattle. The event was to last for several hours.  *Id.*, ¶ 3.

In determining whether to grant Mr. Turay's request for escorted leave, Mr.

Cunningham considered: (1) the nature and length of the escorted leave; (2) the community

risk associated with granting the request based on Mr. Turay's history of security or escape

risk; (3) Mr. Turay's overall history of stability, cooperative or disruptive behavior, and

violence or other acting out behavior; (4) Mr. Turay's degree of trustworthiness as

demonstrated by his performance in living unit assignments, security level, and general

cooperativeness with facility staff; (5) Mr. Turay's family's level of involvement and

commitment to the escorted leave planning process; (6) the rehabilitative or treatment

REPORT AND RECOMMENDATION - 6

benefits which could be gained by Mr. Turay; and (7) any other information he deemed relevant. *Id.*, ¶ 4.  Mr. Cunningham denied Mr. Turay's request for escorted leave based on the information maintained in SCC's records, which included:

1)      In 1973, Mr. Turay served six months in jail for stealing a motor vehicle.  ECF No. 25, ¶ 5(a).

2)      In 1985, Mr. Turay raped a woman he had met that evening in a bar.  She reported that he had grabbed her throat and threatened to kill her.  Mr. Turay vaginally raped her during which she sustained bruises and abrasions.  She escaped and reported the crime to police.  When the police attempted to arrest Mr. Turay the following day, he fled out his back door.  He remained on the run for over a year, finally being apprehended in Oregon. He was extradited to Washington where a jury convicted him of Rape in the Second Degree and he received an exceptional sentence.  ECF No. 25, ¶ 5(b)

3)      On May 17, 1991, Mr. Turay was released from DOC custody and was being transported to the SCC for detention. En route, he attempted to escape. He needed to be shackled as well as cuffed.  State, County, and local police were called to the scene to assist DOC staff during this incident. SCC staff, upon his arrival at the facility, met with the same resistance.  ECF No. 25, p 5(c).

4)      Mr. Turay carries an Axis I diagnosis of Alcohol Abuse. Just three months before Mr. Turay made his leave request, he was found in his bedroom holding a bottle of an intoxicating substance, virtually unconscious, unable to walk, or speak coherently. A week later, Mr. Turay disagreed with moving to a bedroom on a different living unit, became physically aggressive with staff, and barricaded himself in his bedroom.  The move to a

REPORT AND RECOMMENDATION - 7

different living unit was a treatment decision to assist Mr. Turay in managing his behavior. Mr. Turay's treatment team considers him to require high management. Mr. Turay has numerous convictions, including convictions for rape, based on criminal conduct that occurred when he was under the influence of alcohol or drugs.  ECF No. 25, ¶ 5(d).

     5)    The event for which Mr. Turay requested leave to attend was a memorial event for Mr. Turay's father who had passed away two months earlier. The event was to occur at a museum.  It was not clear to Mr. Cunningham whether the event was going to be similar to an orchestrated funeral service, such as what one might expect in a house of worship, or whether it would more like a wake or a cocktail party where intoxicants would be available.  ECF No. 25, ¶ 5(e).

     Mr. Cunningham weighed the foregoing facts against the benefits of allowing Mr. Turay to attend the event, and concluded that conditions could not be imposed that would provide sufficient safeguards to prevent escape during the leave of absence.  *Id.*  He asked Chaplain Duncan to convey his decision to Mr. Turay.  *Id.*, ¶ 6.

     Mr. Cunningham states that he weighed the factors relevant to community risk as indicated in Wash. Rev. Code 388, 880-100 and that Mr. Turay's litigation history at the SCC had no bearing on his decision regarding Mr. Turay's escorted leave request.  *Id.*, ¶ 9. He states further that he has no actual knowledge of the extent of Mr. Turay's litigation activities or how that compares to any other SCC resident.  Every SCC resident is engaged in one form of litigation or another, and quite a few residents spend a significant amount of their time litigating.  *Id.*, ¶ 10.

REPORT AND RECOMMENDATION - 8

**DISCUSSION**

In order to sustain a cause of action under 42 U.S.C. § 1983, a plaintiff must show (i) that he suffered a violation of rights protected by the Constitution or created by federal statute, and (ii) that the violation was proximately caused by a person acting under color of state law. *See Crumpton v. Gates,* 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he was legally required to do that caused the deprivation complained of. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)).

In the civil commitment setting, a patient's liberty interests are balanced against the relevant state interests to determine whether the state has violated the patient's constitutional rights. *Youngberg v. Romeo*, 457 U.S. 307, 318 (1982). The law generally requires a careful balancing of the rights of individuals who are detained for treatment, not punishment, against the state's interests in institutional security and the safety of those housed at the facility.

**A.     Eighth Amendment – Cruel and Unusual Punishment**

To state a claim under 42 U.S.C. § 1983, Mr. Turay must allege that Defendants, while acting under color of state law, violated a right secured by the Constitution or laws of the United States. *See West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 101 L.Ed.2d 40 (1988). Mr. Turay alleges that his right to be free from cruel and unusual punishment was violated when the Defendants denied his escorted leave request.

Federal law does not entitle prisoners to compassionate leave or even to have contact with their families while in prison. *Thomas v. Farley*, 31 F.3d 557, 559 (7th Cir.1994) (Federal law does not entitle prisoner to compassionate leave); *Toussaint v. McCarthy*, 801 F.2d 1080,

REPORT AND RECOMMENDATION - 9

1114 (9th Cir.1986) (No right to contact visits in prison), *abrogated in part on other grounds by*

*Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).  However, it may be

possible to state a claim for relief if the granting of such leave were customary and prison

officials denied it to a particular prisoner in order to cause psychological distress or with

deliberate indifference to his mental health.  *See, e.g.,* 31 F.3d at 559.

   Thus, the denial of Mr. Turay's request for leave to attend the memorial service of his

father cannot be thought to be cruel and unusual unless the denial was motivated by a "deliberate

indifference" to his mental health.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  Defendants

cannot be held liable unless they know of and disregard an excessive risk to his health.  *Id.*, at

837.  An inmate must establish that there was both some degree of actual or potential injury, and

that society "considers the [acts] that the plaintiff complains of to be so grave that it violates

contemporary standards of decency to expose anyone unwillingly [to those acts]."  *Helling v.*

*McKinney*, 509 U.S. 25, 36 (1993); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976).

   The undisputed facts do not support a claim of cruel and unusual punishment.  The

evidence reflects that Mr. Cunningham considered Mr. Turay's specific history and

circumstances as required by Washington law.  Mr. Cunningham concluded that conditions could

not be imposed that would provide sufficient safeguards to prevent an escape by Mr. Turay

during the leave of absence.   Mr. Cunningham took into consideration that the event was a

memorial event for Mr. Turay's father who had passed away two months earlier, the venue of the

event, and the uncertainty regarding whether intoxicants would be available at the event.  ECF

No. 25, ¶ 5(e).

   Mr. Turay does not dispute that Mr. Cunningham considered and relied on information

contained in SCC's records regarding his history and circumstances.   Mr. Turay does not dispute

REPORT AND RECOMMENDATION - 10

1   the accuracy of the records.  Instead, Mr. Turay attempts to provide explanations for his

2   behavior.  For example, Mr. Turay describes his 1985 escape from custody and eluding capture

3   for nearly a year as "nothing more than a misdemeanor absconding charge; a petty crime," and

4   asserts that he, "was unaware that a warrant for his arrest had been issued until he returned from

5   a vacation." ECF No. 17 at 1.  However, the information available to Mr. Cunningham is that

6   Mr. Turay fled out his back door when police attempted to arrest him on a rape charge and

7   remained on the run for over a year before he was apprehended in Oregon.  Mr. Turay was then

8   extradited to Washington where a jury convicted him of Rape in the Second Degree and for

9

10  which he received an exceptional sentence.  ECF No. 25, p. 2, ¶ 5(b).

11          Mr. Turay also states that he has no recollection of a 1991 escape attempt.  ECF No. 17

12  at 1.  However, records reflect that on May 17, 1991, Mr. Turay attempted to escape when he

13  was released from DOC custody and was being transported to the SCC.  He had to be shackled

14  and cuffed and State, County, and local police were called to the scene to assist DOC staff during

15  this incident.  ECF No. 25, ¶ 5(c).  Mr. Turay also questions the relevance of his alcohol abuse to

16  Mr. Cunningham's decision to deny his leave request.  ECF No. 17, p. 2.  SCC records indicate

17  that Mr. Turay carries an Axis I diagnosis of Alcohol Abuse, that three months before his

18  request, he was found in his bedroom holding a bottle of an intoxicating substance, virtually

19  unconscious, unable to walk, or speak coherently.  A week later, Mr. Turay became physically

20  aggressive with staff, and barricaded himself in his bedroom when he disagreed with the

21

22  treatment decision to move him to a different living unit.  ECF No. 25, ¶ 5(d).

23          Whether Mr. Turay remembers his history differently or believes his past behaviors are

24  not significant enough to warrant concern is immaterial to this court's determination of whether

25  Mr. Cunningham acted with deliberate indifference when he denied the leave request.  The

26

REPORT AND RECOMMENDATION - 11

records relied on by Mr. Cunningham have not been shown to be inaccurate.  Mr. Turay provides

no evidence from which it may be inferred that Mr. Cunningham acted with deliberate

indifference to Mr. Turay's mental health when Mr. Cunningham denied the leave request based

on the information available to him.  Mr. Turay's view of his history is also irrelevant to the

court's determination of whether Mr. Cunningham actually exercised professional judgment

when tasked with determining whether conditions could be imposed sufficient to protect

community safety and the risk of escape.   The undisputed record reflects that Mr. Cunningham

exercised professional judgment in assessing the relevant factors required by Washington law.

Accordingly, the undersigned recommends that Mr. Turay's Eighth Amendment claim be

dismissed.

**B.      Equal Protection**

The "Equal Protection Clause of the Fourteenth Amendment commands that no State

shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

essentially a direction that all persons similarly situated should be treated alike." *City of*

*Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S. Ct. 3249, 87 L. Ed. 2d 313

(1985).

Mr. Turay alleges that he was treated differently from another SCC resident, Kenneth A.

Haller, Jr., who was recently allowed to attend his mother's funeral.  ECF No. 17, p. 2.  Mr.

Turay alleges that Mr. Haller has a much more recent absconding charge and that he is a 47 year

old man with a history of drug and alcohol abuse, who is verbally and physically abusive of staff.

*Id.*  In contrast, Mr. Turay states that he is a 60 year old, legally blind man with no history of

violence toward staff.  *Id.*

REPORT AND RECOMMENDATION - 12

In September 2010, Kenneth Haller, Jr. requested escorted leave to attend a family funeral. The information available to Mr. Cunningham was that Mr. Haller has been at the SCC since 2005 and resides on a medium management living unit.  ECF No. 25, ¶ 7.  His sexual offenses include sexual contact with pre-pubescent girls who were relatives or children of women with whom he'd had romantic relationships.  Mr. Haller's behavioral issues at SCC have been mixed, overall representing a need for medium management.  Mr. Haller's SCC records include no indication that he has a history of escape or attempted escape from custody.  *Id.*  However, Mr. Haller reported to Chaplain Duncan that on one occasion he left community custody in Washington to work in Alaska for a few months. ECF No. 26, ¶ 4.

Chaplain Duncan was unable to find any SCC record corroborating this event.  He concluded that if Mr. Haller's community corrections officer knew he had left the state in violation of his placement terms, Mr. Haller would have been taken back into custody and that such an event would have shown up in his SCC records.  *Id.*  Chaplain Duncan forwarded Mr. Haller's relevant information, including the self-reported community custody incident, to Superintendent Cunningham.  *Id.*   Superintendent Cunningham did not consider Mr. Haller's self-report to indicate an unmanageable risk of escape while attending the funeral, where his self-reported reason for leaving the state was to work and he returned to the state voluntarily.  ECF No. 25, p 7.  In addition, because the funeral that Mr. Haller wished to attend was to occur at a church in Tacoma, it was to be a typical orchestrated event and was within a facility with which SCC escort staff has experience taking residents.  *Id.*

REPORT AND RECOMMENDATION - 13

Mr. Cunningham considers Mr. Turay's and Mr. Haller's individual circumstances, history, offenses, behavioral management needs, and the nature of the events each sought to attend, taken as a whole, to be qualitatively different. *Id.*, ¶ 8.

As noted above, Defendants have established that decisions regarding escorted leaves at the SCC are made on an individual basis considering the individual resident making the request, and that particular resident's criminal and behavioral history, the nature and location of the event, among other considerations as stated in the Washington Administrative Code.   It has also been established that Mr. Turay has two documented escape attempts in his SCC records, but that Mr. Haller has no documented escape attempt.  As noted by Mr. Cunningham, if Mr. Haller's unverified self-report that he went to Alaska to work while he was on community custody is true, the nature of that event is qualitatively different from fleeing police in hot pursuit or attempting to escape during transport while in actual, physical custody.   In addition, the event Mr. Turay wished to attend was at a venue where it was unknown whether alcohol would be served and where SCC escort staff could not sufficiently safeguard against an escape attempt. In contrast, Mr. Haller's event was a traditional funeral service at a house of worship.

The evidence reflects that Mr. Cunningham's decisions to deny Mr. Turay's request and seven months later, to grant Mr. Haller's request, were based on each resident's individualized histories and treatment needs.   Other than the undisputed fact that Mr. Turay was not allowed to attend his father's memorial service and Mr. Haller was allowed to attend his mother's funeral, there is no evidence that they are similarly situated or that Mr. Cunningham did not actually exercise his professional judgment in considering whether to grant or deny the requests.  Mr. Haller and Mr. Turay are simply not similarly situated.  Thus, the undersigned recommends that

REPORT AND RECOMMENDATION - 14

Mr. Turay's claim that he was denied equal protection of the law when Mr. Cunningham denied his escorted leave request should be dismissed.

## C.     First Amendment Retaliation

In his response to Defendants' Rule 12(b)(6) motion, Mr. Turay also claims that Mr. Cunningham denied the escorted leave request "in retaliation for Mr. Turay's tireless civil rights litigation against the S.C.C., aimed at forcing the facility to comply with accepted professional standards." ECF No. 17, p. 2.

A plaintiff can establish that his First Amendment rights have been adversely affected by retaliatory conduct only when the plaintiff shows: (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of plaintiff's constitutional rights. *Mendocino Environmental Center v. Mendocino County*, 192 F.3d 1283, 1300-01 (9th Cir. 1999).   Challenges to institutional restrictions that are asserted to inhibit First Amendment interests must also be analyzed in terms of the legitimate policies and goals of the corrections system. *Pell v. Procunier*, 417 U.S. 817 (1974)

To prevail on a First Amendment retaliation claim, a plaintiff must initially show that the protected conduct was a substantial or motivating factor in the defendant's decision. *Carepartners LLC v. Lashway*, 545 F.3d 867, 877 (9th Cir. 2008).  If the plaintiff makes this initial showing, the burden shifts to the defendant to establish that it would have reached the same decision even in the absence of the protected conduct. *Id*.  To meet this burden, a defendant must show by a preponderance of the evidence that it would have reached the same decision; it is insufficient to show merely that it could have reached the same decision. *Id.*

REPORT AND RECOMMENDATION - 15

Retaliation is not proven by simply showing that a defendant prison official took adverse action after he knew that the plaintiff prisoner had engaged in constitutionally protected activity. Although timing can be considered as circumstantial evidence of a retaliatory event, timing alone cannot establish retaliation. *See Pratt*, 65 F.3d at 808. As noted by one district court, "merely being aware of ongoing litigation does not establish that all adverse actions taken thereafter are retaliatory." *Estrada v. Gomez*, No. C 96-1490 SI (PR), 1998 WL 514068 * 3 (N.D. Cal. 1998). The overall circumstances of the alleged retaliation must be considered and not simply the order of events. *Id*. The *Estrada* court's comments on inferring retaliatory motive through timing alone are instructive:

> The oversimplified "timing and knowledge" analysis has numerous problems. First, it presumes vindictiveness by the prison guard. Second, it elevates a prisoner who exercises his constitutional rights to a higher status: *e.g.*, if a guard refuses to serve lunch to a prisoner who told him he filed a grievance and to a prisoner who had not done so, the former would have a retaliation claim and the latter would not. Third, it encourages litigiousness because, with planning, a prisoner could have constant federal court supervision of his tenure in prison. An industrious prisoner could file a grievance when he arrived at prison and perhaps weekly thereafter, broadcast his grievance-filing activities widely, and then file federal civil rights actions claiming that every later adverse action by a guard was retaliatory. The court would be asked to pass on the legitimacy of all actions the prisoner did not like. Fortunately, a closer look at the law of retaliation shows that the standard is slightly higher and the claim is not so susceptible to manipulation.

*Id*. at n. 2.

Mr. Turay alleges that, "[g]iven the stark contrast between Mr. Haller" and himself, "it is obvious that Mr. Cunningham's decision to deny Plaintiff's escorted leave to attend his father's funeral was not only arbitrary and capricious, but a blatant abuse of discretion in retaliation for Mr. Turay's tireless civil rights litigation against the S.C.C., aimed at forcing the facility administration to comply with accepted professional standards." ECF No. 17 at 2. According to

REPORT AND RECOMMENDATION - 16

Mr. Turay, Mr. Haller has an absconding charge, a history of drug and alcohol use, and is verbally and physically abusive to staff while Mr. Turay describes himself as 60 years old, legally blind, with no history of violence toward staff. *Id.* As noted above, the record does not support Mr. Turay's claim that his equal protection rights were violated when Mr. Haller's request for escorted leave was granted while his was not. Moreover, viewing Mr. Turay's allegations in the light most favorable to him, also does not lead to a conclusion that Mr. Cunningham denied Mr. Turay's requested for escorted belief *because* of his litigation activities. There is no evidence that a substantial or motivating factor in Mr. Cunningham's decision to deny the leave request was Mr. Turay's litigation activities. Rather, the evidence reflects that Mr. Cunningham's decision was based on Mr. Turay's specific history and circumstances, and a real concern that conditions could not be imposed to provide sufficient safeguard to prevent Mr. Turay's escape during the leave of absence.

Accordingly, the undersigned recommends that Defendants' motion for summary judgment on Mr. Turay's retaliation claim be granted.

**D.    United Nations Convention Against Torture**

In his response to the Defendants' motion to dismiss for failure to state a claim (ECF No. 14), Mr. Turay also asserts that Mr. Cunningham's denial of his request for escorted leave violated the "United Nations Convention Against Torture or other Cruel, Inhumane, or Degrading Treatment Treaty" (UNCAT). ECF No. 17, pp. 3-4. This cause of action does not appear in Mr. Turay's complaint. ECF No. 5. This claim is without merit. Denial of escorted leave is not "torture" as defined in the UNCAT and 18 U.S.C. §§ 2340-1340B. The alleged "torture" did not occur outside the United States. 18 U.S.C. § 2340A(a). It is undisputed that Mr. Turay is a resident of the SCC, that Defendants are employed at the SCC, that the SCC is

REPORT AND RECOMMENDATION - 17

located in Steilacoom, Washington, which is in the United States.  ECF No. 5, pp. 2-3.

Moreover, the UNCAT creates no substantive or procedural right enforceable by law by any

party in any civil proceeding.  18 U.S.C. § 2340B.

The undersigned finds that Mr. Turay's UNCAT claim of "torture" is without merit and

should be dismissed.

**E.      Eleventh Amendment – Official Capacity Damages Claims**

In his complaint, Mr. Turay seeks money damages.  ECF No. 5.   Defendants argue that

to the extent Mr. Turay's seeks damages against the Defendants in their official capacities as

state actors, this is in essence a claim against the state precluded under the Eleventh

Amendment.   Defendants are correct.

Absent a waiver of sovereign immunity, neither states nor state officials in their official

capacities are subject to suit in federal court under 42 U.S.C. § 1983.  *Will v. Michigan Dept. of

State Police,* 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989).   A suit against a state

official in his or her official capacity is not a suit against the official but rather is a suit against

the official's office.  *Brandon v. Holt,* 469 U.S. 464, 471, 105 S. Ct. 873, 877, 83 L. Ed. 2d 878

(1985).  As such, it is no different from a suit against the State itself.  *See Kentucky v. Graham,*

473 U.S. 159, 165-66, 105 S. Ct. 3099, 3104-05, 87 L. Ed. 2d 114 (1985); *Monell v. Dep't of

Social Servs. of City of New York*, 436 U.S. 658, 690, n.55, 98 S. Ct. 2018, 2035, n.55, 56 L. Ed.

2d 611 (1978).

Accordingly, Defendants are entitled to summary judgment on any claim for damages

brought against them in their official capacities.

REPORT AND RECOMMENDATION - 18

1    **F.      Personal Participation – Defendants Harris and Duncan**

2              To obtain relief against a defendant, Mr. Turay must prove the particular defendant has

3    caused or personally participated in causing the deprivation of a particular protected

4    constitutional right.  *Arnold v. International Business Machines Corp.,* 637 F.2d 1350, 1355 (9th

5    Cir. 1981); *Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir. 1977).  To be liable for "causing"

6    the deprivation of a constitutional right, the particular defendant must commit an affirmative act,

7    or omit to perform an act, which he or she is legally required to do, which causes the plaintiff's

8    deprivation.  *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978).

9

10             In order to state a civil rights claim, a plaintiff must set forth the specific factual bases

11   upon which he claims each defendant is liable.  *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir.

12   1980).  A defendant cannot be held liable under 42 U.S.C. § 1983 solely on the basis of

13   supervisory responsibility or position.  *Monell v. New York City Dept. of Social Services*, 436

14   U.S. 658, 694 n.58 (1978); *Padway v. Palches*, 665 F.2d 965 (9th Cir. 1982).  Vague and

15   conclusory allegations of official participation in civil rights violations are not sufficient to

16   withstand a motion to dismiss.  *Pena v. Gardner*, 976 F.2d 469, 471 (9th Cir. 1992).  The inquiry

17   into causation must be individualized and focus on the duties and responsibilities of each

18   individual defendant whose acts or omissions are alleged to have caused a constitutional

19   deprivation.  *Rizzo v. Goode*, 423 U.S. 362, 370-71 and 375-77 (1976); *Leer v. Murphy*, 844 F.2d

20   628 (9th Cir. 1988).  Sweeping conclusory allegations against an official are insufficient to state

21   a claim for relief.  The plaintiff must set forth specific facts showing a causal connection

22   between each defendant's actions and the harm allegedly suffered by plaintiff.  *Aldabe*, 616 F.2d

23   at 1092; *Rizzo*, 423 U.S. at 371.

24

25

26

REPORT AND RECOMMENDATION - 19

Here, the record reflects and Defendants admit that Mr. Cunningham made the decision to deny Mr. Turay's escorted leave request.  Mr. Turay has made no allegations against Ms. Harris and there are certainly no allegations that Ms. Harris denied his request for escorted leave or was involved in the denial.  In fact, the statute makes clear only the superintendent, with the approval of the secretary, is authorized to approve an escorted leave.  Wash. Rev. Code 71.09.210.

As to Chaplain Duncan, Mr. Turay asserts only that the chaplain conveyed Mr. Cunningham's decision denying the request for escorted leave.  ECF. No.5 at 4.  The evidence reflects that Chaplain Duncan's participation was limited to conveying messages between the superintendent and Mr. Turay and in compiling Mr. Turay's records for the superintendent's review.  Government officials, regardless of their title, can only be held liable under § 1983 for his or her own conduct and not the conduct of others.  *See Ashcroft v. Iqbal*, ---U.S. ----, ----, 129 S. Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).   "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the constitution." *Iqbal*, 129 S.Ct. at 1948.

Defendants Harris and Duncan can only be held liable for their own actions or lack of action.  Mr. Turay has provided no evidence that either of these individuals deprived him of a constitutional right.  Accordingly, the undersigned recommends that Mr. Turay's claims against Defendants Cathi Harris and Chaplain Greg Duncan be dismissed with prejudice.

**G.   Qualified Immunity**

Defendants contend that they are entitled to qualified immunity as to Plaintiff's constitutional claims.  The court has concluded that Defendants did not violate Mr. Turay's

REPORT AND RECOMMENDATION - 20

constitutional rights.  Therefore, it is not necessary to address Defendants' qualified immunity arguments.

### CONCLUSION

For the reasons stated above, the undersigned recommends that Defendants' motion for summary judgment (ECF No. 24) be **GRANTED.**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter for consideration on **April 15, 2011,** as noted in the caption.


DATED this  23rd  day of March, 2011.


Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 21